UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JACKEY BOWLING,           )
                          )
            Plaintiff,    )
                          )
    vs.                   )          No. 1:11CV43 HEA
                          )
BOB HOLDER, et al,        )
                          )
            Defendants.   )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants Bob Holder and Jered

Morgan's Motion for Summary Judgment, [Doc. No. 88], Defendant Joseph

Coronado's Motion for Summary Judgment, [Doc. No. 99], and Defendants

Correctional Medical Services, Milo Farnham and John Williams' Motion for

Summary Judgment, [Doc. No. 112].  Plaintiff opposes the Motions. For the

reasons set forth below, the Motions are granted.

## Introduction

Plaintiff brought this action for an alleged violation of his Constitutional

rights during his confinement at the Dunklin County Jail.  Plaintiff's Complaint

and Amended Complaint[1] alleges that Defendants violated his constitutional

_____

[1]  Plaintiff filed a Motion for Leave to File an Amended Complaint on April 15, 2011,
wherein Plaintiff included a paragraph against Joe Doe or Jane Doe # 6 regarding an alleged
diagnosis of kidney

rights by delaying medical treatment while he was a pre-trial detainee in the

Dunklin County Jail and that he did not receive certain diagnostic tests before he

was transferred to the Missouri Department of Corrections. Plaintiff claims these

actions constitute deliberate indifference to his medical needs.

## Facts and Background

Plaintiff resides in Kennett, Missouri. Defendant Holder is the Sheriff of

Dunklin County, Missouri and has been such since 1996. Defendant Morgan

was a correction officer at the Dunklin County Jail.. Defendant Coronado is a

licensed practical nurse. Defendant Corizon, Inc., f/k/a Correctional Medical

Services, Inc., (CMS), is a private entity which provides medical services to

inmates through physicians, nurses and allied health care providers within the

Missouri Department of Corrections. Defendants Williams and Farnham work as

independent contractors for Corizon and provide medically necessary services to

inmates in the Missouri Department of Corrections system.

Prior to Plaintiff's incarceration in the Dunklin County Jail in 2009,

Plaintiff had spent 21 months in the Missouri Department of Corrections and had

been released on parole in February of 2009. Plaintiff was re-arrested on January

24, 2009 for driving while intoxicated. Plaintiff plead guilty to driving while

intoxicated and also had his parole revoked and had about four years and four

months left on his prior time to serve in the Department of Corrections. Plaintiff returned to the Department of Corrections in May of 2009 because he would not plead guilty to the DWI at the time, but then was returned in July of 2009 to Dunklin County and then back to the Department of Corrections after his guilty plea.   Plaintiff was released from the Department of Corrections August 6, 2011.

Prior to January of 2009, Plaintiff had had no medical care for any condition related to his heart nor had he been treated by any physician for anything related to his heart.  Up until 2008, and for about 12 years prior to that time, Plaintiff was a cocaine user.  Plaintiff was using crack and regular cocaine.

When Plaintiff was booked into the Dunklin County Jail on January 24, 2009, he was asked questions on a medical questionnaire including if he was on any medications.  Plaintiff also indicated that he had no heart condition.  When Plaintiff was booked into the jail in January of 2009 he was also on a hold because of a parole violation.

Between January and March of 2009, Plaintiff did not ask for any medical request forms because he didn't think it was a wise idea due to his legal situation because he was in the middle of a plea bargain and he did  not want to cause any trouble.  The only thing Plaintiff did between January 24, 2009 and March 20, 2009 was to request the nurse to see a doctor and that was in March of 2009.  The

jail does have medical request forms along with grievance forms available for inmates and are given out by the corrections officers. Plaintiff stated that he had not filed any grievance forms with the Sheriff's Department during the January to March 2009 time frame because he was not aware of their existence. However, Plaintiff did execute a medical information sheet.

On March 21, 2009 Plaintiff complained of having some issues relative to nausea and vomiting. The incident occurred on March 21, 2009 at approximately 2:30 a.m. At that time, Plaintiff indicated he had intensive pressure across the entire width of his chest and radiating pain down both arms, having difficulty breathing, was nauseous, felt faint. Defendant Coronado has no specific recollection of having been called by a corrections officer on March 21, 2009. Plaintiff asked to see a physician when the nurse arrived the next Monday. Defendant Coronado saw plaintiff on March 23, 2009. Plaintiff did request to go to the hospital, not see a physician nor have a nurse evaluate him because he had little faith in the jail doctor.

Everyone that comes into the jail is asked about medical information. In addition, each inmate is given a grievance policy and procedure sheet.

The Dunklin County Jail contracts with Advanced Correctional Health Care to provide medical treatment to the inmates. ACHC provides the nurses, the

doctors and personnel to evaluate and treat detainees. No corrections officers provide medical treatment or make medical decisions concerning when to transport an inmate or detainee to a hospital. The ACHC doctor makes treatment decisions and transport decisions. The ACHC doctor is in the jail weekly and the nurses are in the jail five days per week.

Defendant Coronado was a nurse with ACHC. The Sheriff's Office does not prescribe medication, tests or approval of such. Those must be scheduled and approved by ACHC nursing personnel. The Sheriff's Department does not prescribe medication or order tests or have tests approved.

On March 23, 2009, Plaintiff saw Defendant Coronado and Defendant Coronado made what Coronado designated as an assessment at that time. Plaintiff disagrees that Coronado's actions constituted an assessment. Coronado also met with Plaintiff on March 24, 2009 and returned Plaintiff to general population in the jail at Plaintiff's request. Plaintiff was given an aspirin or Tylenol during the two days in March of 2009. Plaintiff does not specifically recall being given aspirin or Tylenol.

Plaintiff did not file any medical request forms at the Dunklin County Jail from March 24, 2009 until May 9, 2009. Plaintiff did not file any grievances with the Dunklin County Jail that he was not getting medical treatment during the time

of March 24, 2009 through May 29, 2009.

On May 9, 2009, Plaintiff had another episode and was transported to the Twin Rivers Medical Center by jail personnel. During this episode, Plaintiff experienced high blood pressure and a high pulse rate. While at Twin Rivers Medical Center Plaintiff was first seen by a nurse and then a doctor who squirted three doses of nitroglycerin underneath Plaintiff's tongue and the doctor performed some cardiac assessment tests on him. After various tests Plaintiff was returned to the Dunklin County Jail on the evening of May 9, 2009. Plaintiff was given orders for 325 milligrams of aspirin, nitroglycerin tablets as needed and it was recommended that an electrocardiogram be performed and a full stress test if Plaintiff could stand it.

Dr. Tomescu, who treated Plaintiff at the hospital, ruled out that Plaintiff had had a myocardial infarction. No doctor in May of 2009 diagnosed Plaintiff with having had a heart attack.

On May 10, 2009, Plaintiff was transported to the Missouri Department of Corrections. Plaintiff does not know why he was sent to the Department of Corrections even though he was represented by a private attorney at the time.

Defendant Holder testified that he was never aware of any medical conditions of Plaintiff while Plaintiff was in the Dunklin County Jail. Plaintiff

testified that he spoke with Holder about being denied nitroglycerine by another officer. Plaintiff does not specifically identify the date of this conversation.

Defendant Holder was not aware of any diagnostic testing or stress tests that were ordered for Plaintiff. Defendant Holder testified that he was not aware of Plaintiff's episode on March 21, 2009.

On July 7, 2009, Plaintiff was returned to the Dunklin County Jail. When Plaintiff was booked back into the Dunklin County Jail, he signed a medical authorization statement, as well as the inmate grievance policy. Plaintiff was back in the Dunklin County Jail for two or three days for court and to plead guilty to driving while intoxicated, a misdemeanor. During the period of July 7-10, 2009, Plaintiff did not file any medical request forms. Plaintiff did not file any inmate grievances during the July 7-10, 2009, period that he was in the Dunklin County Jail. On July 10, 2009, Plaintiff was returned to the Department of Corrections.

Defendant Williams provided direct medical care and treatment to Plaintiff on thirty seven separate occasions between July 17, 2009 and June 29, 2010, while Plaintiff was incarcerated at Missouri Eastern Correctional Center.

Defendant Morgan, the corrections officer, according to Plaintiff, really did not do a great deal as far as violating Plaintiff's constitutional right except

Defendant Morgan did not seem to have the fortitude to disagree with the decision of his fellow officers. Defendant Morgan's alleged violation was just simply acting in agreement with the other officers' decisions. Plaintiff cannot state who made the direct decision not to send him to the hospital after he requested twice or not to provide a paramedic after his request because Plaintiff wasn't allowed to hear the conversation between the nurse and the other officer on the telephone.

One of the other officers was on the phone with the nurse to determine whether or not Plaintiff should go to the hospital or not. The nurse made the decision that Plaintiff was not going to the hospital in March of 2009.

Plaintiff made a conscious decision not to file any request to go to the hospital between March 24 and May 9 and took no action on his part to request to go to a hospital between March 24 and May of 2009.

In rendering medical treatment to Plaintiff, Defendant Williams examined and monitored Plaintiff, prescribed a variety of medications, ordered diagnostic studies, consulted with outside physicians, educated Plaintiff regarding his medical needs and treatment, and formulated therapeutic treatment

Defendant Farnham is a physician licensed to practice medicine in the State of Missouri. Defendant Farnham provided direct medical care and treatment to

Plaintiff on thirty-five (35) separate occasions in the twelve (12) month period between August 13, 2010 through August 8, 2011 while Plaintiff was incarcerated at Western Missouri Correctional Center ("WMCC").  In rendering medical treatment to Plaintiff, Defendant Farnham examined and monitored Plaintiff, prescribed a variety of medications, ordered diagnostic studies, consulted with outside physicians, educated Plaintiff regarding his medical needs and treatment, and formulated therapeutic treatment.

On July 13, 2009, Plaintiff was transferred from ERDCC to Missouri Eastern Correctional Center ("MECC") where Defendant Williams assumed primary management of Plaintiff's medical care and treatment.  Williams first examined and treated Plaintiff on July 23, 2009.  Williams performed history and physical examination, evaluated the efficacy of the medications Plaintiff was receiving, made necessary medication adjustments, adding Isordil to the treatment regimen.  Williams assigned Plaintiff to the chronic care clinic to provide him closer observation for any cardiology related issues, reviewed Plaintiff's medical records, noted he was awaiting records and follow-up from the cardiologist, Dr. Balcer, ordered diagnostic studies and formulated a clinical plan of care on behalf of Plaintiff Bowling, scheduling him for a follow-up examination

On August 18, 2009, Williams again saw Plaintiff during the follow-up

appointment. Plaintiff reported improvement in his exercise tolerance ever since

beginning the Isordil, which Williams prescribed at the first visit. Plaintiff did not

have chest pain during this visit, but reported mild fatigue and mild headaches he

associated with the Isordil and Nitroglycerin ("TNG"). Williams ordered Tylenol

to treat these mild headaches. Williams noted in the record that he still awaited

the report from the cardiologist, Dr. Balcer, and requested same from Dr. Balcer's

office.

On September 11, 2009, Williams saw Plaintiff during a follow-up visit

during which Plaintiff informed Williams that the nitrates were "doing OK" and

resulting in a decrease in Plaintiff's exertional chest discomfort and noting that

Plaintiff had been noncompliant in taking Metropolol since July 20, 2009.

Williams informed Plaintiff of the results of his laboratory studies and reviewed

the report from the cardiologist received by facsimile. Williams refilled

Plaintiff's prescription for Metropolol as recommended by Dr. Balcer, the

cardiologist, and ordered weekly blood pressure measurements.

On October 6, 2009, Williams examined Plaintiff, noted that Plaintiff

reported his breathing was okay at rest, and his exercise tolerance improved, with

Plaintiff being able to walk to meals and medical without any shortness of breath.

Williams evaluated Plaintiff's vitals signs, evaluated his medications, ordered

Zocor to treat Plaintiff's elevated cholesterol and lipids, prescribed Nitroglycerin as needed, and prescribed the flu vaccine for Plaintiff.

On October 30, 2009, Williams evaluated Plaintiff for complaints of blood from his rectum and complaints of chest pain across his sternum without shortness of breath, sweating or lightheadedness. Plaintiff had taken his Metropolol and Isordil late that day and reported habitually taking his medications late. Williams ordered an electrocardiogram ("EKG"), which Williams read as unchanged from the EKG done on May 9, 2009. Plaintiff's vital signs were normal, his lungs were clear, his heart rate was regular.  Williams examined Plaintiff and diagnosed with internal hemorrhoids, estimated the size of his prostate, and diagnosed the sterna pain as costochondritis, an inflammation of the cartilage connecting the ribs to the sternum, which can mimic the pain associated with cardiac pain. Williams prescribed Acetaminophen as needed for the pain, ordered laboratory studies for PSA and scheduled a follow-up appointment for Plaintiff.

Williams recommended that Plaintiff undergo a stress test and echocardiogram on November 6, 2009.

Plaintiff underwent a stress test and an echocardiogram on December 4, 2009 at St. John's Mercy Medical Center as ordered by Williams.

On December 8, 2009, Plaintiff was seen by Williams in follow-up from his last visit and after undergoing an echocardiogram and a stress test. The results of both tests remained pending at that time. Williams noted Plaintiff's complaints of chest pain when he reached for something without shortness of breath, palpitations or dizziness. Williams assessed this as atypical chest pain and ordered Plaintiff to continue with the previously prescribed medications, ordered laboratory studies and await results of the diagnostic studies recently performed

On January 5, 2010, Williams examined Plaintiff in a follow-up visit during which Plaintiff expressed concern with his job duties and "lay-ins" for no recreation because Plaintiff wished to go outside. Williams noted that the reports from St. John's regarding Plaintiff's echocardiogram and stress test were not yet available and contacted St. John's for the reports. Plaintiff denied any change in his condition and said he had no problem walking to his appointment that day. Plaintiff described what Williams assessed as pleuritic discomfort during coughing or sneezing. A full physical examination, clinical history, vital signs and medication assessment was performed. Williams increased Plaintiff's dosage of Zocor based upon his laboratory results, and encouraged Plaintiff to improve his compliance with medication orders. Williams continued Plaintiff's "lay-ins" for limited activity and scheduled a follow-up appointment.

Williams obtained the results of Plaintiff's echocardiogram and stress test on January 6, 2010, and recommended referral to a cardiologist for re-evaluation based upon the results, showing that the left ventricular size was at the upper limits of normal. Overall left ventricular systolic function was normal. Left ventricular ejection fraction was estimated to be 55%. There was no diagnostic evidence of left ventricular regional wall motion abnormalities. Left ventricular wall thickness was at the upper limits of normal. Right ventricular size was normal. Right ventricular systolic function was normal. The estimated peak right ventricular systolic pressure was mildly increased.

On January 8, 2010, Williams' recommendation for cardiology referral for re-evaluation was approved by the Regional Medical Director of Corizon. On January 11, 2010, Plaintiff was brought to the medical unit by nurses after complaining of chest pain reporting that he developed symptoms after walking from "watch-take" medication administration to his housing unit. Williams noted that Plaintiff had the same type of symptoms on January 9, 2010 after receiving a conduct violation for missing his medication. Williams ordered an EKG which revealed a fast heart rate, but no new changes since October 20, 2009. Plaintiff claimed he had been compliant with his heart medications that morning. Williams reviewed the medication cards for Plaintiff's Metropolol, Isordil and Zocor, and

noted discrepancies in the remaining numbers of these medications compared to Plaintiff's claim of being compliant. Williams prescribed an additional dose of Metropolol, ordered Troponin laboratory tests to determine whether Plaintiff had had a "heart attack," ordered a D-Dimer, moved Plaintiff's housing unit assignment to decrease the distance to the medical unit and placed Plaintiff on oxygen pending the results of the Troponin studies. Williams changed Plaintiff's Metropolol from "keep on person" to "watch-take" to more carefully monitor Plaintiff's compliance. Troponin results were negative, indicating that Plaintiff had not experienced a cardiac event or "heart attack".

On January 18, 2010, Plaintiff was seen by Williams and Plaintiff reported chest discomfort, specifically, the sharp pain previously reported when he brings his arms in toward his chest, as well as a popping feeling in the midsternal area when lying on his back and rolling to his left side. Plaintiff denied any pain contemporaneous to this examination, and no shortness of breath. Vital signs were normal. After conducting a physical examination, Williams ordered that Plaintiff proceed with the cardiology scheduled consultation and for Plaintiff to follow-up with Williams thereafter. Copies of the echocardiogram and stress test were sent to the cardiologist, Dr. Balcer in anticipation of Plaintiff's scheduled visit.

On January 21, 2010, Plaintiff refused his medications and did not show up for "watch-take" of Metropolol and Isordil. The nurse informed Williams and referred Plaintiff to Williams.

Again on February 2, 3 and 4, 2010 Plaintiff refused medications and did not show-up for his "watch-take" medications, Isordil and Metropolol. The nurse discussed Plaintiff's refusal and noncompliance with Williams, and Williams agreed to reduce the Metropolol dosage owing to Plaintiff's complaints of side effects.

On February 15, 2010, Plaintiff was examined by Williams complaining of having had a throbbing feeling in his left chest approximately three times within a four week period, and that the symptoms were relieved by taking two (2) Nitroglycerin ("TNG"). After a full examination, Williams educated Plaintiff on the results of his stress test and echocardiogram, reordered medications and scheduled a follow-up appointment

On February 21, 2010, Plaintiff refused his medications and was a no-show for medication administration, which was discussed with Williams. On this same date, Plaintiff submitted a Medical Services Request ("MSR") requesting that his medications be given to him to take unsupervised and claimed that the Department of Corrections caused his condition and failure to make prescription

appointments.

On March 1, 2010, Plaintiff was sent out of the prison for a visit with the cardiologist, Dr. Balcer for a re-evaluation ordered by Williams and approved by Corizon. Dr. Balcer noted that Plaintiff now describes a "squeezing tearing pain" that occurs mostly when he leans back or turns in his sleep. Plaintiff reported spending 80% of his time in bed and claims he is lightheaded when he sits up abruptly. Plaintiff reported improvement in chest pressure during walking compared to the June 2009 visit with Dr. Balcer. Dr. Balcer reviewed the stress test and echocardiogram reports sent to him by Williams. Physical examination was unremarkable. Dr. Balcer stated, "I think it would be reasonable to proceed with cardiac catheterization at this time to definitively define his coronary anatomy, and if intervenable disease is present this would help plan that course. Alternatively, if no intervenable disease is identified then aggressive medical management would be the best approach." Dr. Balcer recommended, among other things, that Plaintiff's Metropolol be titrated upward to a maximum tolerated dose or 200 mg. Dr. Balcer arranged no cardiology follow-up

On March 2, 2012, Williams recommended Plaintiff undergo a cardiac catheterization consistent with Dr. Balcer's recommendations. On March 3, 2010, Corizon's regional medical director issued an approval for the recommended

cardiac catheterization.

On March 2, 2012, Plaintiff, again, refused his medication and did not show up for medication administration.

On March 8, 2010, Williams examined Plaintiff in follow-up to Plaintiff's cardiology appointment. Williams advised Plaintiff of the cardiac catheterization to be scheduled and continued Plaintiff's medications as prescribed.

On March 14, 2010, Plaintiff refused his medication and was counseled on the risks associated with his ongoing non-compliance with medical instructions.

On March 18, 2010, disciplinary action was taken for failing to report on time for "watch-take" medication administration. Plaintiff states, "the medication causes brain ischemia. This causes short-term memory loss. I would like the medicine returned."

On March 25, 2010, Plaintiff was examined by Williams in follow-up to his last appointment. Williams advised Plaintiff that the cardiologist, Dr. Balcer recommended an increase in the Metropolol, Plaintiff said that he feels this medication is contributing to his fatigue and has no desire to increase the dose as recommended. Plaintiff did not have any dyspnea on exertion or shortness of breath and insisted that the Metropolol would cause excess fatigue resulting in making him bedridden during waking hours. Ultimately, Plaintiff refused to take

an increased dosage of Metropolol as recommended by his cardiologist. Williams ordered a fasting lipid profile. Plaintiff refused his medications and was a "no show" for medication pass.

On April 7, 2010, Plaintiff filed a Medical Services Request complaining of back pain and headache even at rest with numbness on left face, neck, and arm, with lip twitches. On April 13, 2010, Williams conducted a physical examination of Plaintiff owing to these complaints. Williams considered possible vertebral basilar insufficiency, perhaps relating to Plaintiff's history of cocaine abuse, or possible degenerative joint disease of the cervical and lumbar spine. Williams ordered cervical and lumbar spine X-rays, ordered a hepatitis panel, and scheduled a follow-up appointment for Plaintiff.

On April 19, 2010, Plaintiff was transported to Capital Region Medical Center and underwent a cardiac catheterization, as ordered by Williams. The results showed, "hemodynamically significant coronary atherosclerosis including the ostial, LAD, and ramus intermedius branches, as well as proximal right coronary artery stenosis." Cardiology consulted with the cardiovascular surgery department and scheduled surgery for coronary arterial bypass graft ("CABG") surgery, which Williams recommended to Corizon, and was immediately approved.

On April 20, 2010, Plaintiff underwent CABG surgery at Capital Region Medical Center for triple vessel coronary artery disease by Dr. Crouch. Post-operatively, Plaintiff was taken to Jefferson City Correctional Center ("JCCC") on April 24, 20120 where he continued his recovery under the supervision of Corizon physician, Dr. Thomas Baker and Dr. Michael Hakala and the Corizon nursing staff. Plaintiff was discharged to return to MECC on April 27, 2010.

On April 29, 2010, Williams conducted a physical examination of Plaintiff in follow-up to the CABG surgery. Plaintiff complained of incisional discomfort, but no shortness of breath or angina symptoms. Plaintiff reported only taking his Metropolol onetime per day since April 27, 2010. Plaintiff's surgical wounds were healing normally. Williams documented Plaintiff's continued post-operative medication non-compliance, and as a result, ordered all Plaintiff's medications be administered "watch-take" to assure compliance as much as possible. Plaintiff was continued in the chronic care clinic and scheduled for a follow-up examination.

On May 17, 2010, Plaintiff reported to the medical unit nurse that he began having chest pain "three days ago" while standing in line for the canteen. Plaintiff reported taking a Nitroglycerin tablet 10 minutes before the nurses arrived, and upon arrival, the nurses noted Plaintiff's blood pressure could not be palpated,

and he appeared pale and diaphoretic. Shortly thereafter, they obtained a blood pressure of 124/94, and his oxygen level dropped temporarily. Plaintiff complained of a feeling of being choked or smothered. Williams was notified, and he notified the emergency medical services ("EMS"). Williams ordered oxygen, was administered another Nitroglycerin tablet, and sent by ambulance to St. John's Mercy Hospital in St. Louis. Williams contacted Dr. Ferrara, cardiologist, who performed a repeat cardiac catheterization identifying a post-operative 90% occlusion of one of the vein grafts, with the other grafts remaining patent. The occluded graft was stented and Plaintiff remained in the hospital overnight.

On May 18, 2010, Plaintiff returned to MECC from his hospitalization, repeat cardiac catheterization, and stent placement. Williams examined Plaintiff, spoke with the cardiologist who attended to Plaintiff overnight at St. Johns (Dr. Sohn), who reported that Plaintiff was symptom free throughout the night and stated that he felt better today. Williams ordered Plavix daily for one year.

Williams examined Plaintiff again on May 19, 2010, and discussed Plaintiff's case with cardiologist, Dr. Balcer. Plaintiff's medications re-ordered on a "watch-take" basis.

On May 26, 2010, Plaintiff was seen by his cardiovascular surgeon, Dr.

Crouch outside the prison, and also by Williams. Plaintiff continued to complain of chest pain of a different character than before the surgery and post-operative cardiac catheterization, and Dr. Crouch noted his belief that this discomfort was pleuritic pain only and recommended Tylenol for this discomfort. Williams ordered a "lay-in" for an elevator pass for Plaintiff.

On June 5, 2010, Plaintiff went to the medical unit complaining of chest pain, and claimed that he had had chest pain on and off ever since his surgery. Plaintiff took four (4) Nitroglycerin tablets, and thereafter complained of weakness, dizziness, shortness of breath, palpitations, and feelings of being choked and smothered. Plaintiff was examined, his vital signs were stable, and his heart rate was regular. The nurse observed anxiety and confusion. Corizon physician, Dr. Arthur Keiper ordered three (3) sequential Troponin levels, to determine whether Plaintiff was experiencing a coronary event, or "heart attack." The results of all three (3) tests were negative. Plaintiff was monitored in medical overnight and released on May 6, 2012.

On June 7, 2010, Plaintiff was seen by Williams, and reported that during several hot days he took more Nitroglycerin than usual. Plaintiff noted to still have pleuritic symptoms. Vital signs were normal. Williams ordered laboratory studies which were performed on June 8, 2010. Williams recommended a follow-

up appointment with cardiologist, Dr. Balcer, which was approved by Corizon Regional Medical Director on June 9, 2010. Williams ordered laboratory studies which were performed on June 8, 2010

On June 12, 2010, Plaintiff "self-declared" an emergency reporting that his chest hurt. Plaintiff had not taken Nitroglycerin for chest pain as needed. Nurse noted that this was not an emergent or urgent situation, administered said medication and placed Plaintiff in observation for one hour, after which he reported feeling better and was released to his housing unit.

On June 23, 2010, Plaintiff again declared an emergency related to chest pain. Williams ordered an EKG and Troponin testing to rule out the possibility of a coronary event or "heart attack." Williams conducted a physical examination of Plaintiff and noted the Plaintiff experienced sharp left sided chest pain during exertion before examination which was relieved with Nitroglycerin. The EKG revealed improvement in the lateral ischemic changed compared to the tracing done on June 4, 2010, and the Troponin testing was negative for any coronary event. Williams placed Plaintiff in observation and scheduled a follow-up visit in one-week.

On June 29, 2010, Williams saw Plaintiff in follow-up, conducted a history and physical, which was not remarkable, and ordered follow-up.

On July 27, 2010, Plaintiff was transferred from MECC to WMCC, and Defendant Farnham assumed the primary care of Plaintiff beginning on August 13, 2010, when he first examined him as part of the cardiovascular clinic, noting his history, medication regimen, surgery and post-operative course, and reviewed the cardiologist's records. Plaintiff complained of burning pressure when he bends over, lies down or rolls over on his stomach, and indigestion after meals. Farnham prescribed Prilosec for suspected gastroesophageal reflux disease ("GERD"), and recommending avoiding NSAIDS for discomfort to prevent aggravating the GERD. Other medications continued

On August 23, 2010, Plaintiff left the prison for a follow-up evaluation by cardiologist, Dr. Balcer. Dr. Balcer doubted Plaintiff's continued complaints of chest pain are ischemic, but rather related to the sternotomy performed during the CABG surgery. No further follow-up ordered.

On September 7, 9 and 13, 2010, three (3) different nurses noted "health seeking behavior" by Plaintiff.

On September 16, 2010, Plaintiff was examined and treated by Farnham.

On September 20, 2010, Plaintiff declared an emergency related to chest pain. EKG performed, vital signs were stable, clinical picture unremarkable. Farnham ordered a "GI Cocktail," Troponin levels, and observation for four (4)

hours.  Dr. Farnham examined Plaintiff, reviewed the EKG, found no evidence of a coronary event or "heart attack" and released Plaintiff back to his housing unit.

On October 15, 2010,  Farnham examined Plaintiff, who added Norvasc for Plaintiff's elevated blood pressure and scheduled a one month follow-up examination.

On November 15, 2010, Farnham examined Plaintiff during his follow-up appointment. Plaintiff complained of leg pain from knees down every night. Plaintiff's blood pressure was somewhat elevated after being changed to Norvasc, so Farnham added HCTZ and a scheduled a follow-up appointment.

On December 15, 2010, Farnham examined Plaintiff at a follow-up appointment. Plaintiff's blood pressure improved, but medication increased. Plaintiff complained of feet going numb especially when he lies down.  Farnham noted weak peripheral pulses and that vein taken from left leg in which pulses are weaker. Farnham held the Zocor to evaluate whether leg pain was a side effect of this medication.

On January 14, 2011,  Farnham examined Plaintiff who reported no change in leg pain after holding the Zocor, so  Farnham restarted this medication and prescribed walking twice daily and follow-up in cardiovascular clinic.

On January 18, 2011, Plaintiff reported to medical and complained of chest

pain for which he had taken numerous Nitroglycerin to relieve. Nurse Ramsbottom noted left lung "rales," examined Plaintiff, performed vital signs, which were normal. Troponin levels were performed. Later, Plaintiff returned to medical as instructed by nursing and stated, "I'm feeling better, I didn't even want to come back here." Plaintiff observed overnight in medical.  Farnham examined Plaintiff, noted that the EKGs were unchanged, the Troponin levels were normal, and treated Plaintiff with oxygen therapy and "GI Cocktail," which did not help his symptoms, and noted that Plaintiff's lips were cyanotic. Farnham contacted Dr. Balcer to discuss Plaintiff's condition and care, and a repeat cardiac catheterization was recommended by Farnham and approved by Corizon's Regional Medical Director. Plaintiff was transported to Capital Regional Medical Center via ambulance.

On January 20, 2011, Plaintiff underwent a third cardiac catheterization for recurrent angina, or chest pain. Dr. Balcer's report on the catheterization showed an apparent occlusion of all saphenous vein bypass grafts, a widely patent LIMA graft to the LAD, normal hemodynamics, and recommended a stress test, aggressive treatment of lipids and hypertension. The stress test was performed also on January 20, 2012, which revealed a mildly abnormal study.

On January 21, 2011, Plaintiff returned to WMCC, and  Farnham

documented that the stress test was better than expected even though the cardiac catheterization showed occlusion of three arteries.

Plaintiff remained in medical observation at WMCC until January 24, 2011, when Farnham confirmed with Dr. Balcer that Plaintiff believed it was safe to release Plaintiff into "population." Farnham educated Plaintiff regarding the meaning of blockages and about using antacids for chest burning rather than Nitroglycerin. Farnham reviewed Dr. Balcer's report, prescribed a wheelchair as needed and scheduled a follow-up appointment for one week later.

On January 24, 2011, Plaintiff approached nursing inquiring about the criteria for medical parole, and was advised that his condition does not meet the criteria.

On January 27, 2011, Plaintiff declared an emergency based upon chest pain worsening over two hours unimproved by the administration of two (2) Nitroglycerin. Reported sweating and feeling faint. Blood pressure low at 79/52, and skin was cool and clammy. Plaintiff reported having a cough for two days, and feeling like something is stuck in his throat, with associated upper gastric and right upper quadrant pain intermittently. Farnham ordered Plaintiff to be maintained in observation over night, ordered an EKG, held the HCTZ, Metropolol, Amlodipine and Lisinopril, and prescribed a "GI Cocktail." Plaintiff's blood pressure returned to normal, he became alert, with a normal

physical assessment, and stated that the pain did not feel "like cardiac pain."

Plaintiff had hyperactive bowel sounds and reported improvement in the pain

after "GI Cocktail." Farnham examined Plaintiff the next morning, January 28,

2011 in observation, noted his vital signs were stable. Farnham noted that

Plaintiff had a recent orthostatic hypotensive episode and severe coronary artery

disease. Plaintiff's medications restarted, and dosages reduced by Farnham.

Plaintiff's brother contacted nursing about possible medical parole.

Nursing advised brother that Plaintiff did not meet the criteria for medical parole.

On February 9, 2011,  Farnham examined Plaintiff in the cardiovascular

clinic. Farnham ordered a "pill cam" examination of esophagus, increased the

dosage of Prilosec for GERD, reordered Plaintiff's cardiovascular medications

and ordered a follow-up visit following the "pill cam" examination. Farnham

noted that Plaintiff has cardiac angina but also has symptoms of acid reflux and

dysphagia for which he is taking Nitroglycerin.. Farnham recommended "pill

cam" examination and it was approved by Corizon's Regional Medical Director.

On February 16, 2011, Plaintiff reported to nurse that he has been having

"barely controlled heart pains," chest pressure and dizziness, and stated, "I feel this

would have been fatal. I am now certain that without remedial intervention that my

heart problems will end my life in a matter of days, not weeks." Plaintiff further

stated, "I don't know what I need today. I have no pain now." Vitals signs were stable, examination was unremarkable. Nurse noted Plaintiff smiled freely during conversation about his medical problems, and noted that Plaintiff has anxiety about his health problems.

One month later, on March 16, 2011, Plaintiff reported to medical with complaints of left, dull pain radiating to shoulder and back, worse with exertion. Plaintiff's vital signs were normal, he was calm and talkative, and his skin was pink, warm and dry. His assessment was unremarkable. Farnham ordered an EKG which was unchanged showing only an old infarction, and Troponin levels, which were negative. Plaintiff received a "GI Cocktail" with no pain relief after fifteen (15) minutes. Farnham ordered Atropine and placed Plaintiff in observation, to have the Troponin repeated after forty eight (48) hours.

On March 17, 2011, Farnham examined Plaintiff and noted that he was in observation overnight for chest pain helped by Nitroglycerin only after about 10-15 minutes, that his pain gradually lessened after receiving "GI Cocktail," atropine, and antacids, but at no time has he appeared ill upon examination. Plaintiff's EKGs and Troponin levels all were normal except for the old inferior-antero septal "MI." Farnham noted that Dr. Balcer advised the Plaintiff was not a candidate for PTCA or repeat CABG. Farnham considered this non-cardiac chest pain, increased

Plaintiff's Isordil dosage and discharged him from medical observation to follow-up in one week.

On March 18, 2011, Plaintiff again declared an emergency related to sterna chest pain, for which Plaintiff too four (4) Nitroglycerin. The nurse advised Plaintiff that he had taken too many Nitroglycerin. The examination was unremarkable and his vital signs were normal. Patient argumentative and states that the pain he is experiencing is his "heart because his heart is turning to "fat" and it's already enlarged."  Farnham was notified of self-declared emergency. Farnham instructed Plaintiff on how to properly take his medication, and how many Nitroglycerin he is limited to.

On March 25 and 28, 2011, Plaintiff was again admitted to medical observation complaining of chest pain. Physical examination and vital signs normal. Farnham examined Plaintiff and ordered Vistaril. Plaintiff later released from observation after improvement and instructed to continue current plan of care.

On April 1, 2011, Plaintiff requests "nitro patches" and Farnham discussed this treatment option with Plaintiff and contacted Dr. Balcer regarding his recommendations.

On April 14, 2011, Plaintiff reported to Farnham complaining of shortness

of breath. Plaintiff had "pill cam" examination on April 8, 2011 and results pending. He discussed with Plaintiff that Dr. Balcer advised Farnham that there was no vessel in Plaintiff's heart that he could dilate, and that Plaintiff is not a candidate for repeat surgery because the danger of the second surgery would outweigh the minimal benefits that might be achieved. Farnham added Digoxin to regimen and ordered a chest X-ray and Digoxin level.

On April 15, 2011, Plaintiff reported to the medical unit complaining of chest pain, dyspnea and hypertension. Examination and vital signs normal. Farnham ordered Vistaril and when improved, Plaintiff was returned to his housing unit.

On April 16, 2011, Plaintiff returned to the medical unit reporting that he had a shot in the ER. Vital signs remain normal and Plaintiff was admitted to the observation unit. Plaintiff reported that the "shot has already started to relieve the pain and discomfort." Shortly thereafter, Plaintiff stood up and voiced that the pain was better and he was ready to return to his housing unit, which was done.

On April 17 and 18, 2011, Plaintiff again self-declared an emergency voicing that he was tachycardic because "they won't give me my Metropolol there at the window." Plaintiff's heart rate elevated to 123. Farnham ordered Troponin levels which were negative, and ordered Vistaril for anxiety. Plaintiff observed in

medical unit. Farnham re-issued the watch-take order for Metropolol and increased the dosage.

Results of "pill cam" reviewed by Farnham on April 28, 2011. Farnham noted that the "pill cam" suggested Barrett's esophagus of the distal esophagus Farnham recommended an EGD with biopsy as follow-up to the "pill cam" examination, and this was approved by Corizon's Regional Medical Director.

On July 14, 2011, Farnham reviewed the results of Plaintiff's EGD that he underwent at Capital Regional Medical Center on May 24, 2011, which showed no lesions. Dr. Brand, who performed the EGD, dilated the esophagus, which he believes may have lessened the frequency of Plaintiff's pain. Plaintiff reported that ice water relieves his pain now.

On July 21 and 29, 2011, Plaintiff self-declared an emergency for chest pain when lying down. The examination and vital signs were normal. The EKG was unchanged. Pain resolved spontaneously and Plaintiff returned to housing unit on July 21, 2011.. Plaintiff was given a "GI Cocktail" on July 29, 2011 and returned to cell.

On August 3, 2011, Plaintiff against self-declared an emergency for chest pain. Dr. Mullin ordered Troponin levels, which were negative, prescribed oxygen, Atenolol, and kept Plaintiff under observation until results of Troponin levels

received and Plaintiff improved.

Plaintiff again self-declared emergencies on August 5, 8, 11, 24, 2011, all which were treated with examinations, ordering Troponin levels and EKGs, with normal results.

Farnham last encountered Plaintiff on August 10, 2011, for a cardiovascular clinic follow-up. Farnham performed a full history and physical examination, and in his assessment, noted that Plaintiff has dyslipidemia, hypertension, ischemic heart disease, poor cardiac control, symptomatic with the maximum medical care, and that Plaintiff's condition was stable.

During the May 17, 2007 medical evaluation, the nurse at ERDCC observed in the "Objective" section of her documentation that Plaintiff's blood pressure was elevated, he was overweight, had a history, at that time, of drug abuse for thirteen (13) years, and of alcohol abuse for thirty five (35) years.

Plaintiff had demonstrated a pattern of noncompliance to medical instructions and refusal to follow medical directions while under the care of Defendants Williams, Farnham and Corizon, including the following dates:

1. May 26, 2009

2. November 2, 2009

3. January 5, 2010

4. January 9, 2010

.January 11, 2010

6. April 29, 2010

7. September 16, 2010

8. October 30, 2009

9. January 1, 2010

10. January 21, 2010

11. February 2, 2010

12. February 21, 2010

13. March 2, 2010

14. March 8, 2010

15. March 25, 2010

16. March 30, 2010

17. September 16, 2010

18. March 18, 2011.

**Discussion**

**Summary Judgment Standard**

The standard for summary judgment is well settled.  In determining whether

summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enter. Bank*, 92 F.3d at 747. Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Krenik v. Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)." *Hitt v. Harsco Corp.* 356 F.3d 920, 923 (8th Cir. 2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Woods v. DaimlerChrysler Corp.,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with

sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The Court will review the facts in this case with the stated standard in mind.

Plaintiff's claims arise from his status as a pre-trial detainee and as an inmate in the Missouri Correctional system. Pretrial detainee § 1983 claims are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment prohibition of cruel and unusual punishment. *See Kahle v. Leonard,* 477 F.3d 544, 550 (8th Cir.2007) (stating "[t]his makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."). *Holden v. Hirner,* 663 F.3d 336, 340 -341 (8th Cir. 2011). Thus, the Court's analysis is based on the standards set out under the Eighth Amendment.

"The Eighth Amendment prohibits the infliction of cruel and unusual punishment. The treatment a prisoner receives in prison and the conditions under

which he is confined are subject to scrutiny under the Eighth Amendment." *Schaub v. VonWald,* 638 F.3d 905, 914 (8th Cir.2011) (citing *Helling v. McKinny,* 509 U.S. 25, 31 (1993)). To prevail on a claim of deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Id.* (citing *Coleman v. Rahija,* 114 F.3d 778 (8th Cir.1997)). This requires a two-part showing: (1) the inmate suffered from an objectively serious medical need; and (2) the prison official knew of the need, yet deliberately disregarded it. *Id.; See also Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are both questions of fact. *Coleman,* 114 F.3d at 785.

First, the objective component requires a serious medical need be established by the inmate-plaintiff. A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a layperson would easily recognize the necessity for a doctor's attention." *Von Wald,* 638 F.3d at 914 (citing *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995)). If the need is obvious to a layperson, there is no requirement to verify this by medical evidence. *Id.* (citing *Hartsfield v. Colburn,* 371 F.3d 454, 457 (8th

Cir.2004)). The determination that a medical need is objectively serious is a factual finding. *See Coleman,* 114 F.3d at 784. The determination of whether a medical need is sufficiently obvious cannot be analyzed in a vacuum and background knowledge of the inmate's medical condition or medical records is part of the analysis. *Jones v. Minnesota Dept. of Corrections,* 512 F.3d 478, 482 (8th Cir.2008).

Second, the subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need. *Grayson v. Ross,* 454 F.3d 802, 808–809 (8th Cir.2006); *Moore v. Jackson,* 123 F.3d 1082, 1086 (8th Cir.1997). Prisoners alleging deliberate indifference must show more than negligence, even more than gross negligence, and must establish a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir.2000); *Gordon v. Frank,* 454 F.3d 858, 862 (8th Cir.2006). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed ." *McRaven v. Sanders,* 577 F.3d 974 at 979 (8th Cir.2009) (citing *Gamble,* 429 U.S. at 104–105). "The inmate must

clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson v. Shuffman,* 603 F.3d 439, 448–449 (8th Cir.2010). The Supreme Court has held prison officials may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted. *Farmer,* 511 U.S. at 826. Deliberate indifference "must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" *VonWald,* 638 F.3d at 915 (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir.1998)). The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer,* 511 U.S. at 842. However, "a prisoner's mere difference of opinions over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Taylor v. Bowers,* 966 F.2d 417, 421 (8th Cir.1995).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman,* 114 F.3d at 784 (citing

*Branstad,* 73 F.3d at 176). Yet, "[n]ot every ache and pain or medically recognized condition supports a claim of Eighth Amendment violation and the claim must involve a substantial risk of serious harm to the inmate." *Williams v. Arkansas Dept. of Correction,* 207 S.W.3d 519, 523–524 (2005) (citing *Roberson v. Goodman,* 293 F.Supp.2d 1075 (2003). "To evaluate a claim for medical need, the civilized minimum of public concern for the health of prisoners is determined, striking a balance between objective need and cost." *Id.,* citing *Ralston v. McGovern,* 167 F.3d 1160.

Plaintiff complains that Defendant Holder was deliberately indifferent to his serious medical needs by not responding to Plaintiff's notifying Holder that Plaintiff did not receive nitroglycerin at some point. Holder denies knowledge of this conversation, however, assuming the facts in the light most favorable to Plaintiff, as the Court must, the Court assumes the conversation did in fact occur. Even so, Plaintiff's claim against Holder based solely on this assertion must fail. The record establishes that Plaintiff received the nitroglycerin. Plaintiff has not presented any evidence that any delay in receiving the nitroglycerin had any adverse affect on Plaintiff's health.

With respect to Defendant Coronado, Plaintiff claims that Coronado

informed the deputies that Plaintiff must remain in isolation until Coronado reported for work on Monday and that Coronado refused to order that he be taken to the hospital in March, 2009. Further, Plaintiff claims that Coronado informed Plaintiff that he would see the doctor on Thursday. Plaintiff claims that there was damage to his heart that could have been avoided with treatment in the first three to six hours following the incident.

Plaintiff claims that Defendant Williams was informed of prescribed tests from the Department of Corrections cardiologist and then informed plaintiff that he felt it was his duty to his company in July, 2009 to treat Plaintiff as a regular chronic care patient. Plaintiff further claims that Defendant Williams became hostile and defied the medical reports.

Plaintiff claims Defendant Farnham told him there was nothing wrong with him and that Farnham continued to ignore and disregard the cardiologist's directives as to Plaintiff's medical condition. Further, Plaintiff claims that Defendant Farnham refuses to follow section 217.250 RSMo., "Terminal or Shortened Life Directives." According to Plaintiff, Defendant Farnham has stated that Correctional Medical Services will not provide remedial treatment, and that Plaintiff's life will end as a result of this denial within days, if not weeks or

months.

Although Plaintiff had no previous indication of any heart condition, it can be assumed for the purposes of these motions that chest pains and numbness can be a serious medical condition. However, when an inmate's claim is based upon a delay in treatment, as Plaintiff's is here, the objective seriousness of the alleged deprivation is also measured by reference to the effect of that delay on his condition. Therefore, to succeed on his claim, Plaintiff must place in the record verifying medical evidence to establish the detrimental effect of the delay. *Coleman,* at 784 (citing *Crowley,* at 502). Plaintiff must show that the Defendant's alleged delay of medical care adversely affected his heart condition. *See Coleman,* at 784; *Crowley,* at 502; *Sentry-Haugen,* at 890.

> To prevail on a claim that a delay in medical care constituted cruel and unusual punishment, an inmate must show both that: (a) the deprivation alleged was objectively serious; and (b) the prison official was deliberately indifferent to the inmate's health or safety. *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995). When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, "the objective seriousness of the deprivation should also be measured 'by reference to the *effect* of delay in treatment.' " *Id.* (quoting *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1188 (11th Cir.1994)). To establish this effect, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment ..." *Crowley v. Hedgepeth,* 109 F.3d 500, 502 (8th Cir.1997) (quoting *Hill,* 40 F.3d at 1188).

*Laughlin v. Schriro* 430 F.3d 927, 929 (8th Cir. 2005).

In response to Defendants Motion for Summary Judgment, Plaintiff has presented no medical records showing that any of the alleged actions by these Defendants had any adverse effect on his heart condition. There is no verifiable medical evidence showing that Plaintiff's heart condition worsened because of the alleged delay in treatment. Plaintiff merely states that his condition was worsened and that according to him, his life has been shortened. To the contrary, the record before the Court establishes that each of these Defendants reacted in a manner which was proper at the time and in response to Plaintiff's condition. Therefore, Plaintiff has failed to establish that the Defendant's alleged delay in medical treatment adversely effected his heart condition. This failure precludes Plaintiff's claim that the Defendants' delay in providing him the medical attention he believes he was entitled to receive amounted to deliberate indifference to his medical needs.

## Conclusion

In conclusion, the Court finds that, in viewing the facts in the best light for Plaintiff, a reasonable jury could not conclude that these Defendants violated Plaintiff's constitutional rights. Summary Judgment is therefore warranted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Bob Holder and Jered Morgan's Motion for Summary Judgment, [Doc. No. 88], is granted;

**IT IS FURTHER ORDERED** that Defendant Joseph Coronado's Motion for Summary Judgment, [Doc. No. 99], is granted;

**IT IS FURTHER ORDERED** that  Defendants Correctional Medical Services, Milo Farnham and John Williams' Motion for Summary Judgment, [Doc. No. 112], is granted

A separate judgment will be entered upon the conclusion of all pending issues herein.

Dated this 13th day of March, 2013.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE